UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**JACQUELINE FLYNN,**

          **Plaintiff,**

v.                                    Case No: 6:23-cv-1890-PGB-DCI

**THERMACELL REPELLENTS,
INC. and LOWE'S HOME
CENTERS, LLC,**

          **Defendants.**
_____/

## **ORDER**

This cause is before the Court on the Defendants Thermacell Repellents, Inc. and Lowe's Home Centers, LLC's ("**Lowe's**")[1] Revised *Daubert* Motion to Exclude Dugan's Opinions. (Doc. 96 (the "**Motion**")). Plaintiff Jacqueline Flynn ("**Plaintiff**" or "**Ms. Flynn**") submitted a response in opposition. (Doc. 100 (the "**Response**")). Upon consideration, the Defendants' Motion is denied.

**I.   BACKGROUND**

Previous Orders have discussed the procedural history of this litigation. Pertinent here, the Defendants argue that the opinions of the Plaintiff's fire cause and origin expert, Mr. Patrick B. Dugan, CFI ("**Mr. Dugan**"), concerning the origin, cause, and extent of damage caused by the fire must be excluded as

---

[1] Collectively, Defendants Thermacell Repellants, Inc. and Lowe's will be referred to as the "Defendants."

unreliable. (Doc. 96, p. 2). The Defendants also seek to exclude Mr. Dugan's opinion that the first responders and witnesses who observed the fire corroborate his conclusion that the fire originated on the second-floor balcony, where Plaintiff claims to have placed the Thermacell Patio Shield. (*Id.*).

The Plaintiff counters that the methodology employed by Mr. Dugan includes an inspection of the site and fire debris, the review of discovery and depositions, and analysis of weather reports, all of which satisfy *Daubert*. (Doc. 100, p. 3). The Defendants do not challenge Mr. Dugan's qualifications to render opinions concerning the origin and cause of the fire. The Defendants only contest the second and third prongs of the *Daubert* analysis: methodology and helpfulness to the trier of fact. (Doc. 96, pp. 18–21). If Mr. Dugan's opinions are based on sufficiently reliable methods, they are undoubtedly helpful to the jury. If his opinions are unsupported *ipse dixit*, they must be excluded.

## II.   LEGAL STANDARDS[2]

"[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Ruiz v. SharkNinja Operating LLC*, 6:21-cv-1628-WWB-LHP, 2024 WL 640859, at *1 (M.D. Fla. Feb. 6, 2024) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))). The determination of admissibility is

---

[2] The standards for the admission of expert opinions announced in *Daubert* have been discussed in previous Orders entered in this case. (Docs. 109, 111).

"uniquely entrusted to the district court," which is given "considerable leeway in the execution of its duty." *Id.* (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005)). And "[t]he burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Id.* (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

When an expert relies primarily on experience in forming his opinions, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Augustin*, 661 F.3d 1105, 1125 (11th Cir. 2011). "Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically." *See Housley v. LiftOne, LLC*, No. 7:20-CV-00010-LSC, 2021 WL 4197596, at *6 (N.D. Ala. Sept. 15, 2021) (quoting *Breidor v. Sears, Roebuck & Co.*, 772 F.2d 1134, 1138 (3d Cir. 1983)). Thus, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how the experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at *3. "Accordingly, 'the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.'" *Id.* (quoting *Allison*, 184 F.3d at 1312).

That said, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison*, 184 F.3d at 1311 (citing *Daubert*, 509 U.S. at 596). This is because "the primary focus of a *Daubert* inquiry is on the principles and methodology underlying expert opinion testimony, not the conclusions they generate." *Housley*, 2021 WL 4197596, at *3 (citing *Daubert*, 509 U.S. at 595).

## III. DISCUSSION

Mr. Dugan's analysis of the cause and origin of the fire that damaged the Plaintiff's home is outlined in his expert report and deposition. (Docs. 96-4, 96-3).[3] In his report, Mr. Dugan states that he employed generally accepted standards, customs, and practices regarding fire investigations, including National Fire Protection Association ("**NFPA**") 921, *Guide for Fire and Explosion Investigations*. (Doc. 96-4, p. 2). His analysis includes documenting the fire scene and identifying burn patterns, such as the area of greatest degree of burn, depth of charring, height of the burn, fuel load, time factors, the effect of fire suppression activities on fire scene preservation, and preferential pathways for the spread of fire. (*Id.*).

Mr. Dugan established that on the afternoon of the fire, Plaintiff purchased the Thermacell Patio Shield from Lowe's, arriving home around 5:30 p.m. (*Id.* at

---

[3] Mr. Dugan's expert report and deposition are also attached to the Plaintiff's Response. (Docs. 100-3, 100-4).

4

p. 3). Around 7:15 p.m., after her son set up the device, Ms. Flynn placed it on a glass-topped wicker table on the second-floor balcony and turned it on. (*Id.*). Ms. Flynn went downstairs to prepare dinner for her family. (*Id.*). Around 8:00 p.m., someone saw flames or an orange glow outside. (*Id.*). When she went to investigate, Ms. Flynn saw flames coming from the second-floor balcony. (*Id.*).

Mr. Dugan's site inspection and investigation revealed that the "most significant fire damage was the second-floor balcony at the left rear of the home . . . [and] [f]ire patterns confirmed that the fire extended from the rear balcony and propagated out the left side toward the neighboring home." (*Id.*). Mr. Dugan observed that "the oriented strand board . . . underlayment on the balcony had been consumed, especially in the area where the table had been located. [And] [a] portion of the floor had been burned away at the rear wall, in the area where the product had been placed on the table (burn through)." (*Id.*). Mr. Dugan also found that "[a]ll burn patterns were directional from the rear wall of the structure where the table had been located," consistent with the fire starting where the Patio Shield had been placed 45 minutes before the fire was observed. (*Id.*). He further observed that the fire extended from the second-floor balcony into the interior rooms, which suffered heavy smoke, fire, and thermal damage. (*Id.*). Based on his analysis, Mr. Dugan offered several opinions regarding the cause and origin of the fire. (*Id.* at pp. 4–5). Mr. Dugan's methodology was developed in greater detail at his deposition and is worthy of comment.

The site inspection was followed by a laboratory examination of fire debris in July 2021 and January 2024. (Doc. 96-3, 12:22–13:25). While Mr. Dugan did not find remnants of the Patio Shield, he explained that its components are plastic, metal, and butane, which is highly flammable, and that there could be microscopic ceramic components. (*Id*. 14:4–15:6). Moreover, the firefighters used one and ¾ inch hose lines to suppress the fire, which generated 150 gallons of water per minute at 100 pounds of nozzle pressure. (*Id*. 17:2–8). Under such pressure, the components of the Patio Shield could disperse widely. (*Id*.). Mr. Dugan also factored weather conditions into his analysis and determined that an eight-mile-per-hour wind was present and sufficient to spread the fire. (*Id*. 29:18–30:14).

Mr. Dugan also testified that he found no evidence of an electrical source starting the fire. (*Id*. 50:1–10). He examined the wiring and receptacle on the second-floor balcony, and if an appliance (other than the Patio Shield) caused the fire, he would expect to find evidence. (*Id*. 50:9–51:3). Mr. Dugan examined the wiring, ceiling fan, and lights for electrical failure and found none. (*Id*. 51:5–18). He concluded that the television located on the second-floor balcony did not cause the fire, because it was unplugged. (*Id*. 52:18–24). Had the television been plugged in, he would have expected to find a remnant of the male end of the power lead in the outlet. (*Id*.). Mr. Dugan also inspected the electrical service that enters the left side of the residence and removed the meter, and nothing of evidentiary value was observed. (*Id*. 62:4–18). The same was true for the two interior circuit breaker panels in the garage. (*Id*.).

Mr. Dugan ruled out arson, noting that the Flynn's owned the home for 18 years before the fire, there was no mortgage on the residence, they had good credit, and the home had never been on the market for sale. (*Id.* 63:23–64:8). Moreover, the Flynn's had been with the same insurance company since 2003. (*Id.*). Thus, none of the tell-tale indicators of arson were present. Mr. Dugan further noted that all indications were that the fire was accidental and was caused by the Patio Shield. He testified that a "heavy fire load" was present in proximity to the Patio Shield, consisting of wicker on the table, cushions on the chairs, and plastic coverings. (*Id.* 70:14–20). Additionally, bamboo-type wicker curtains called Sunbrella drapes were present and flammable and could reach the Patio Shield with the wind. (*Id.* 71:3–22). Mr. Dugan did not identify any other ignition source aside from the Patio Shield, causing him to identify the product as the fire source. (*Id.* 76:12–78:20, 81:24–82:16).

Mr. Dugan testified that the burn patterns support his opinion that the Patio Shield caused the fire. (*Id.* 61:5–9; 85:23–86:19). He concluded that the fire started at the table area, and debris from the table started to burn and dropped down, catching the floor and chairs on fire. (*Id.* 86:16–19). He noted that Chapter 19.4.4.3 of NFPA 921 provides that there are circumstances where the ignition source cannot be identified, but the ignition sequence can be logically inferred. (*Id.* 96:21–97:25). In such cases, the inference may be arrived at through the testing of alternate hypotheses involving potential ignition sequences, provided the conclusion regarding the remaining ignition sequences is consistent with all

7

known facts. (*Id.*). Simply put, the absence of the ignition source in the fire debris does not prevent an expert from identifying the ignition sequence. Here, Ms. Flynn purchased the Patio Shield, placed it on the second-floor patio table, and within 45 minutes, the balcony was on fire. Electrical causes of the fire were ruled out, leaving the Patio Shield as the ignition sequence, supported by burn patterns. (*See also* Doc. 96-4, pp. 4–5 (expert opinions)).

Mr. Dugan's investigation and analysis easily satisfy *Daubert*'s mandate that an expert employ a "sufficiently reliable" methodology. His opinions are based on sufficient facts and data; he does not unjustifiably extrapolate his research to reach an unfounded conclusion; he considered—and ruled out—contradictory data (other known ignition sources); his analysis is based on objective data including burn patterns, weather, timing, and available ignition sources, and Mr. Dugan is as careful as an expert would be in conducting professional work outside the context of paid litigation. *See Daubert*, 509 U.S. at 593–94; FED. R. EVID. 702 advisory committee notes to 2000 amendments. The Defendants' criticism of Mr. Dugan's methodology and resulting opinions goes to the weight that the jury may give such testimony—not its admissibility.

For example, the Defendants argue that Mr. Dugan did not find remnants of the Patio Shield or PIC Coil. (Doc. 96, p. 8). This criticism ignores Mr. Dugan's explanation that the components of the Patio Shield are combustible and were easily dispersed by the water suppression efforts. As for the PIC Coil, Ms. Flynn testified she did not ignite the PIC Coil, and the Defendants offer no competent

8

evidence to the contrary. Defendants also contend that Mr. Dugan "falsely" opined in his report that there was no evidence suggesting an alternative fire source, because at deposition, he acknowledged that television, ceiling fan, and lights were competent ignition sources. (*Id.* at p. 11). This argument mischaracterizes Mr. Dugan's report where he opines that "[t]he product was the cause of the fire because it was the only *competent* source of ignition or heat in the area of origin." (Doc. 96-4, p. 5 (emphasis added)). Mr. Dugan ruled out all other potential sources for ignition or heat, including the television, ceiling fan, lights, wiring, outlets, fuse, and meter boxes, leaving the Patio Shield the only *competent* ignition source. There is nothing "false" about Mr. Dugan's opinion on the cause of the fire.

  The Defendants further argue that Mr. Dugan's opinions regarding the cause of the fire should be excluded because he did not remove the outlet to examine it before ruling it out. (Doc. 96, p. 20). Mr. Dugan testified that the outlet was destroyed in the fire. (Doc. 96-3, 52:7–12). As discussed above, Mr. Dugan also explained that he determined the outlet was not in use and ruled out other electrical faults. Defendants also challenge Mr. Dugan's opinion that the Patio Shield caused the fire, because he defers to another expert to explain *how* the device failed. (Doc. 96, p. 19). Mr. Dugan does not need to identify the failure mechanism to opine that the ignition sequence leads him to conclude the Patio Shield was the only *competent* ignition source. Therefore, Defendants' request to exclude Mr. Dugan's opinion that there were no other competent sources of ignition is denied.

The Defendants also seek to exclude Mr. Dugan's statement that the "observations of the witnesses and responding firefighters were also consistent with a fire that began in the area of the product" on the balcony. (*Id.* at p. 21). Lieutenant Lizbeth Desio ("**LT Desio**") was the first firefighter on the scene, arriving at 8:19 p.m. (Doc. 95-6, 6:1–17, 9:7–17). LT Desio testified that based upon her observations at the scene, there is no indication that the fire began anywhere other than the second-floor patio. (*Id.* 40:12–20). Neither party identifies the statement of any other witness who observed the location of the fire. LT Desio's statement that fire was observed emitting from the rear, second-floor, balcony of the home, (*id.* 29:20–24), is consistent with Mr. Dugan's opinion that the first responder concluded the fire began in *the area* of the product on the balcony, (Doc. 96-4, p. 5). Whether Mr. Dugan was suggesting that the first responders and other witnesses observed the fire emanating from the Patio Shield, rather than where the device would have been placed more generally, is best reserved for cross-examination. Defendants' motion to exclude Mr. Dugan's opinion that witnesses and first responders concur with his conclusion as to the origin of the fire is denied.

Finally, the Defendants' request to exclude Mr. Dugan's opinion that the fire caused extensive smoke, fire, and thermal damage to the interior and exterior of the residence is denied. Mr. Dugan inspected the scene and provided a detailed description of the damage caused by the fire. (Doc. 96-3, 56:6–58:8, 60:21–61:15). Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an

opinion. The Defendants do not challenge Mr. Dugan's considerable experience in fire cause and origin investigations. He is well-qualified to offer an opinion that the fire caused extensive damage to the home, even in the absence of a written estimate of the loss. Whether the damage to the residence was extensive or something less than that is best explored on cross-examination.

## IV.   CONCLUSION

For these reasons, the Defendants' Revised *Daubert* Motion to Exclude Mr. Dugan's Opinions (Doc. 96) is **DENIED.**

**DONE AND ORDERED** in Orlando, Florida on July 28, 2025.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties